## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JASON CRIAG and RODRICK SHOOTS, SR., | ) ) ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:23-cv-00269-KD-M** |
| | ) | |
| CITY OF MOBILE, | ) | |
|     **Defendant.** | ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment and Brief in Support, (Docs. 65, 66), filed by Defendant City of Mobile ("the City" or "Defendant"); the Response, (Doc. 69), filed by Plaintiffs Jason Craig ("Craig") and Rodrick Shoots, Sr. ("Shoots"), (collectively, "Plaintiffs"); and the Reply, (Doc. 72), filed by the City. Craig and Shoots are African American fire captains with the Mobile Fire Rescue Department ("MFRD") alleging unlawful discrimination and retaliation by the City. Their claims involve the MFRD terminating the employment of a probationary firefighter—Kay'ana Adams ("Adams")—in 2022. Upon consideration, and for the reasons below, the motion is **GRANTED IN PART.**

### I.    Findings of Fact[1]

### A.  Craig and Shoots

Craig began with the MFRD as a firefighter in 1998. (Doc. 70-1 at 12 p. 51). He was promoted to captain in 2007. (Id.). Craig has been the vice president of the Progressive Black Firefighters Association ("PBFA") for around the past eight years. (Id. at 7 p. 41). Craig was assigned to Lathan Station in 2022. (Id. at 5 p. 22). Craig reported to District Chief Jack Busby ("Busby") at the time

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

of the events in 2022. (Id. at 14 p. 53). Busby reported to Deputy Chief J.D. Young ("Young"), who reported to Assistant Chief James Frank ("Frank"), who reported to Fire Chief Lami ("Lami"). (Id. at 15 p. 54). Johnny Morris ("Morris") was the Assistant Chief of Staff. (Id.). Morris considered Craig a very good captain. (Doc. 70-2 at 18 p. 49).

Craig was Adams's captain and immediate supervisor. (Id. at 28 p. 86). A few months into Adams's employment at Lathan Station, she raised a concern to Craig that people around the station had a problem with her being a triple minority—a black, female, and lesbian. (Id. at 29 p. 87). Craig asked Adams if she wanted to put the concern in writing, and she told him no. (Id.).

A captain ensures that MFRD personnel comply with the departmental rules and regulations—which personnel certify they have read—and addresses those personnel who do not comply. (Doc. 64-5 at 8–9 p. 20–21). Craig understands that even if a subordinate has a problem with a rule, it is still a captain's duty to enforce it. (Id. at 6 p. 16). Prior to his suspension, Craig had no disciplinary history with the department. (Doc. 70-3 at 12 p. 84). Craig had not been suspended or terminated from any other employer. (Doc. 70-1 at 6 p. 40).

Shoots began with the MFRD as a firefighter in 1994. (Doc. 64-11 at 6 p. 88). He was promoted to inspector in 2002. (Id. at 7 p. 89). In 2011, he was demoted to the firefighter position for six months. (Id.). Later in 2011, he was promoted to captain. (Id.). He was a captain at the time he was terminated. (Id.). Prior to his termination, Shoots had filed six grievances, received verbal counseling seven times, and received a written reprimand once. (Doc. 70-12). Other than verbal counseling in 2022 for questioning the composition of a recruiting committee in a reply all email, Shoots had not been disciplined by the MFRD since 2010. (Id.). Shoots also reported to Busby. (Doc. 70-5 at 27 p. 122).

Shoots had a reputation in the department of bringing up race concerns to Lami via email. (Doc. 70-3 at 16–18 pp. 88–90). Shoots is a member of the PBFA. (Doc. 64-11 at 3 p. 18). Shoots was serving as the PBFA president at the time of his termination. (Doc. 70-5 at 19 p. 81). In this role, Shoots acted as a representative for members during pre-disciplinary hearings and interviews with the City's Office of Professional Responsibility ("OPR"). (Id. at 19, 36 pp. 81, 149). Shoots served as Adams's PBFA representative while she worked as a probationary firefighter for the MFRD. (Doc. 70-4 at 3 p. 13). Adams got involved with the PBFA after experiencing some harassment and because Shoots was a captain at her station. (Id. at 6 p. 58). During her first few months of employment at Lathan Station, Adams informally told Shoots that other employees, including Tony Rutland ("Rutland"), would regularly call her sir or guy. (Id. at 7 p. 113).

### B. MFRD's Grooming Policy and Adams's Tattoo

The MFRD uses an online platform for training, and MFRD personnel must log on periodically to review new and existing policies. (Doc. 64-6 at 16 p. 38). All personnel review and have access to the City's Equal Employment Opportunity policy ("EEO policy"), and MFRD provides training on it. (Doc. 64-5 at 13 p. 58; Doc. 64-14). The EEO policy was usually posted on the bulletin board at Lathan. (Doc. 64-5 at 15 p. 64).

Concerning tattoos, MFRD Rule 710, revised as of June 2021, provides:

1. Tattoos may be visible while in uniform. Any designs considered vulgar, racist, sexist, distasteful, displaying nudity or offensive images, a violation of the Department's harassment or discrimination policy, or otherwise deemed inappropriate are not permitted and will be covered in their entirety while representing the department.
2. Tattoos on the face or neck are prohibited.
3. Tongue splitting, abnormal shaping of the ears, eyes, nose, or teeth, and transdermal implantations other than hair replacements are prohibited.

(Doc. 64-15 at 3).

In June of 2022, Adams obtained a head and neck tattoo. (Doc. 70-4 at 10 p. 121). Adams acknowledges reading Rule 710, but she believed the policy was vague and allowed her to cover up a head or neck tattoo while on duty. (Doc. 70-4 at 13 p. 132). Shoots also believes that Rule 710 is vague. (Doc. 70-5 at 30 p. 137). And Craig recalls other firefighters having visible tattoos on their neck and nobody really caring. (Doc. 70-1 at 39 p. 105).

Craig, after learning of Adams's tattoo, had a discussion with Busby as to whether the tattoo was in violation of the grooming policy. (Doc. 70-1 at 31 p. 96). Craig says that Chief Busby told him to hold tight because they were working on amending the policy and that Busby did not have an answer as to whether there was a violation. (Id.). Craig also had a conversation with the public safety director who told him that they were in the process of revising the tattoo policy. (Id.).

Shoots learned of Adams's tattoo soon after she received it. Shoots did not address the tattoo as being in violation of policy because Adams covered it with band-aids and makeup. (Doc. 70-5 at 32–33 pp. 145–46). Craig recalls seeing some ink on the back of Adams's head but not her neck because Adams covered it with band-aids and a collared shirt every time he saw her. (Doc. 70-1 at 37–38 p. 102–03). Craig did not believe the portion of Adams's tattoo on the back of her head was in violation of MFRD policy because the policy said neck and did not reference the head. (Id.).

### C. OPR and its First Investigation into Adams's Tattoo

The City of Mobile's Office of Professional Responsibility ("OPR") was created in January 2022. (Doc. 70-6 at 4 p. 16). OPR was formed to be a third-party entity to investigate a variety of issues, including instances of employee misconduct, and to create a fair and objective system of investigation. (Id.). The OPR Handbook states that "[t]he primary charge of OPR is to sustain a credible investigative system by ensuring the existence of responsive complaint investigations characterized by objectivity, integrity, and impartiality." (Doc. 70-15 at 4). OPR is ultimately

responsible for determining whether an employee is in violation of a policy, but any disciplinary action that results from a violation comes from the department. (Doc. 70-6 at 6–7 pp. 22–23). Robert Lasky ("Lasky") served as the director of OPR in 2022. (Id. at 3 p. 14).

On July 7, 2022, Lami forwarded a complaint to OPR of a possible policy violation of MFRD Rule 710 regarding Adams's tattoo. (Doc. 70-16). OPR interviewed Adams on July 7, 2022, and a picture of her tattoo was taken. (Id. at 3). OPR's report found that Adams was in violation of Rule 710 when she obtained a tattoo on her neck while employed with the MFRD. (Id. at 3). OPR's report contained an amended finding that the City has proposed a new tattoo policy, and that upon approval, Adams will be able to comply with the new policy if she maintains a hairstyle that covers the tattoo adequately. (Id. at 5).

### D. Adams's September 8, 2022, Advisory Hearing

After the conclusion of OPR's investigation of Adams, Adams attended a September 8, 2022, advisory hearing with Shoots before MFRD Chiefs Morris, Frank, Young, and Busby. (Doc. 70-2 at 3–4 pp. 16–17). Morris did most of the speaking and read aloud the contents of two letters dated September 8, 2022. (Id. at 5 p. 19). The first letter informed Adams that the OPR found her in violation of Rule 710 and that, as a result, her probationary period would be extended six months (September 11, 2022, extended to March 11, 2023). (Doc. 70-18 at 2). This letter also explained that Adams could maintain compliance with Rule 710 by maintaining "a hairstyle that covers the tattoo adequately (meaning keep your hair grown out to cover the tattoo on your head)." (Id.). However, the letter warned Adams that if she did not appropriately cover the tattoo at all times while on duty, she would be in "repeated violations that will lead to progressive discipline up to termination." (Id.). The second letter advised Adams that her probationary period was extended to March 11, 2023. (Doc. 70-18 at 3).

Frank asked Adams if she understood what she needed to do to stay in compliance, and she assured him that she did. (Doc. 70-7 at 10 p. 28). Adams asked if she could wear a wig to comply, and she was told that she could. (Doc. 70-4 at 42 p. 145). Adams also recalls being told that she could use a bandage to cover it up and that she could use makeup. (Id. at 40–41 pp. 142–43). Adams's hair was grown out during this hearing. (Id. at 54 p. 208).

Craig did not attend the hearing because Adams was only allowed one representative, and she chose Shoots. (Doc. 70-2 at 8 p. 27). Craig was never told what happened at the meeting, and he was never told what Adams was supposed to do to comply with the rules. (Doc. 70-1 at 42 p. 111).

Frank instructed Busby to visit Lathan Station after the meeting and go over the letters with Adams and Craig to ensure that they understood what was required for Adams to stay in compliance. (Doc. 70-7 at 11 p. 32). Shoots recalls Busby visiting the station after the hearing and discussed it with him. (Doc. 70-5 at 38 p. 166). Shoots says that Busby made the statement: "Take care of your people and tell Ms. Adams to get a big gun." (Id.). Busby also called Craig and told him to protect his troops the way he does and to protect himself and be careful. (Doc. 70-1 at 48 p. 136).

### E.  Other MFRD Employees with Tattoos on the Neck

Around the time of the September 8, 2022, advisory hearing, chief officers of the MFRD were instructed to inspect and report possible violations of Rule 710 to OPR. (Doc. 64-6 at 8 p. 22). Two other MFRD employees were investigated regarding their tattoos—Mike Allen ("Allen") and Ron Lucky ("Lucky"). (Id. at 6–7 pp. 201–21; Doc. 70-2 at 9 p. 28). Allen was a white male fire-service driver. (Doc. 64-43 at 3). Lucky was an African American male probationary firefighter. (Id.).

Allen received a letter on August 17, 2022, from Frank advising him that the OPR had found him in violation of Rule 710. (Doc. 70-19). However, the letter explained that Allen was in compliance with the City's new tattoo policy, so no further action would be taken. (Id.). Frank attests that Allen's tattoo is on his shoulder and neck, and that OPR determined that Allen's tattoo was not visible above the neckline of a collared shirt and is not in violation of the City's new tattoo policy. (Doc. 64-43 at 3–4).

Lucky received a letter on September 13, 2022, from Morris advising him that the OPR investigated his tattoo and found that he was in violation of Rule 710 and the City's new tattoo policy. (Doc. 70-20). Lucky was directed to modify the tattoo before the end of his working test period (3/12/23) to comply with the rules. (Id.). The letter advised Lucky that if he did not follow this directive, he would be subject to progressive discipline up to termination. (Id.). The letter also advised Lucky that he was required to submit a plan of action in carrying out this directive and that he would be administratively assigned to the MFRD Training Division until the modifications were complete. (Id.) Lucky was hired by the MFRD despite having a frontal neck tattoo. (Doc. 64-43 at 3). Frank attests that Lucky's tattoo was not visible during the interview process because he wore a collared shirt and tie. (Id.). Lucky began the process of tattoo removal but later decided to resign from MFRD. (Id.).

Damonique Evans ("Evans") is an African American female with the MFRD who has a tattoo on the lower portion of the back of her neck. (Doc. 64-43 at 3). Evans was not investigated by OPR. (Id.). Frank attests that Evans's tattoo is not visible above the neckline of a collared uniform shirt, and her tattoo would not violate the City's public safety tattoo policy. (Id.).

Adams also names Warren Stanley and Alan Campbell as two white firefighters who had visible neck tattoos. (Doc. 69 at 6). Craig "does kind of remember Warren Stanley" having a neck

tattoo. (Doc. 70-1 at 39 p. 105). The only details Craig remembers about Stanley are that he is white and that he last worked with the MFRD "three or four years ago." (Id. at 41 p. 107). Shoots recalls that a "Mr. Campbell" had a neck tattoo, but he does not testify that Mr. Campbell is white or that his name is Alan. (Doc. 70-5 at 29 p. 132). There is also no time frame for when "Mr. Campbell" had a tattoo.

### F. Attempted Tattoo Inspections on September 29, 2022

On September 29, 2022, Rutland and Chief Frank had a conversation at a retiree luncheon. (Doc. 64-6 at 19 p. 45; Doc. 64-10 at 5–6 pp. 17–18).[2] Rutland recalls flagging Frank down to discuss transferring from Lathan Station because "the environment had changed." (Doc. 64-10 at 5–6 pp. 17–18). Frank recalls Rutland mentioning Adams as a reason for requesting a transfer. (Doc. 64-6 at 20 p. 46). During their talk, the topic of Adams's tattoo came up. (Id. at 21 p. 48). Rutland reported that Adams "had just gotten a haircut" and that her tattoo was visible. (Id.).

Frank then spoke with Chief Lami over the phone about Adams's tattoo. (Id. at 22 p. 49). Lami verified through Captain Stacy Everson, who had contact with Adams on September 29, 2022, that Adams's tattoo was clearly visible above her collar and natural hairline. (Doc. 64-30 at 6). Lami contacted Lasky and asked him how to proceed. (Doc. 70-3 at 4 p. 37). Lami testifies that he and Lasky discussed whether to send Captain Browning (an OPR investigator) to take a picture at the station or whether to send a supervisor. (Id.). Lami recalls feeling that it was not appropriate to send the OPR investigator to the station, and that sending the supervisor was the best option. (Id.).

Lami told Frank to have Chief Keller send someone to get a picture of Adams's tattoo. (Doc. 64-6 at 22 p. 49). Keller instructed Chief Ballard to carry out the task. (Doc. 70-9 at 3 p. 13).

---

[2] This conversation occurred three days after Rutland was interviewed by OPR regarding a complaint Adams made against him. (Doc. 70-6 at 13–14 pp. 61–62). Adams's complaint against Rutland was filed thirteen days after Rutland submitted a complaint against her. (Doc. 64-24).

Ballard was responsible for Lathan Station on that day because he was on an overtime shift. (Id. at 5 p. 15).

When Ballard arrived at Lathan Station, he told Craig that he was there to evaluate Adams's tattoo and that he needed to take a picture of the tattoo to determine if there was a policy violation. (Doc. 64-11 at 30 p. 170; Doc. 70-9 at 6 p. 16). Shoots was also made aware that Ballard was there to take a picture of Adams's tattoo. (Doc. 64-11 at 30 p. 170; Doc. 70-9 at 6 p. 16). Craig called Adams over and told her that Ballard needed a picture of her tattoo. (Doc. 70-5 at 17 p. 170). Ballard also told Adams that he was sent to get a picture of her head. (Id.). Adams rebuffed the request, stating that she was tired of being harassed. (Id.).

While Adams was explaining her situation to Ballard, Shoots told Adams that Ballard was not her friend. (Doc. 64-11 at 33 p. 173). Shoots recalls asking Ballard if he could have a minute to make some phone call and Shoots says that Ballard agreed. (Id.). Ballard denies that Shoots asked to make phone calls. (Doc. 64-2 at 10 p. 20). Shoots tried calling Chief Lami, Chief Frank, and Lasky and received no answer. (Doc. 64-11 at 31 p. 171). Lasky, however, returned Shoots's call. (Id.). Both Shoots and Lasky recall Lasky advising Shoots that he could take his own picture of Adams's tattoo for independent documentation. (Doc. 64-30 at 6; Doc. 70-5 at 42 p. 172). Lasky recalls advising Shoots to allow Ballard to take the photo of Adam's tattoo. (Doc. 64-30 at 6). Shoots recalls Lasky saying that he had not heard anything about a picture of Adams's tattoo. (Doc. 70-5 at 41 p. 171). When Shoots walked back out, Ballard was gone. (Id. at 32 p. 172).

Ballard recalls the entire action lasting "less than 15 minutes, possibly even under 10 minutes." (Doc. 70-9 at 8 p. 21). Ballard remembers the tattoo being visible but partially covered with a band-aid. (Doc. 64-2 at 10 p. 20). Ballard's Incident Report on the day of the inspection indicates that Adams's tattoo was plainly visible. (Doc. 64-27 at 2). Ballard's Incident Report also indicates

that Craig advised him that the issue had already been dealt with, that Shoots told Adams that Ballard was not their friend, and that Craig was cordial during the matter. (Id. at 3). Shoots admits telling Adams that day that Ballard was not their friend. (Doc. 64-11 at 33 p. 173).

After leaving, Ballard called Keller. (Doc. 70-9 at 10 p. 26). Ballard recalls telling Keller that he did not feel comfortable pushing the issue and that claims of harassment were made. (Id.). Keller called Chief Frank and told him that he could not get the photo. (Doc. 64-6 at 24 p. 52). Lami called Keller and told Keller that he needed to get a picture of the tattoo. (Doc. 70-10 at 4 p. 19). Keller then called Ballard and advised him to direct Craig and Adams to report to Station 12 (Keller's station). (Doc. 64-2 at 16 p. 26). Ballard gave this order to Craig. (Id. at 17 p. 27).

Shoots called Keller and told Keller that he wanted to represent Adams in his capacity as Adams's union representative when she went to Keller's office. (Doc. 70-10 at 5 p. 20). Keller told Shoots that only Craig—as Adams's immediate supervisor—was directed to accompany Adams to have the picture taken. (Id.). Shoots stated that he disagreed and wanted something in writing to state that he was denied the opportunity to represent Adams. (Id.).

When Craig and Adams arrived, Craig entered Keller's office by himself. (Doc. 70-10 at 6 p. 21). Keller told Craig that he had been given an order to take a picture of Adams's tattoo. (Id. at 7 p. 22). Keller recalls Craig stating that Adams should have representation. (Id.). Keller asked Craig whether Adams was out of policy, and Craig stated that he did not know what happened at the advisory hearing. (Id. at 6–7 p. 21–22). Keller recalls Craig repeating that he did not know what happened at the hearing and relaying Adams's message that she wanted legal counsel to advise her if she should take the picture. (Id.).

When Adams entered the office, Keller explained to her the MFRD rule on obeying directives and advised her that he had been given a directive to take a picture of her tattoo. (Id. at 8 p. 24).

Keller recalls Adams saying that she did not feel comfortable turning around in the presence of men. (Id. at 9 p. 25). Keller offered to get a female supervisor. (Id.). Keller recalls Craig strongly objecting and then saying that he felt like Adams needed representation. (Id.). Keller remembers saying "okay" and then Adams leaving the office and going back to the truck. (Id.).

Keller called Lami and explained the situation, and Lami said he would get back to Keller. (Id.). Lami remembers Keller saying that Adams was objecting to the picture due to discomfort. (Doc. 64-8 at 10–11 pp. 42–43). Lami later called Keller back and told him to tell Adams that she could either have the photo taken or be placed on paid administrative leave. (Id. at 11 p. 43).

Keller told Craig to bring Adams into the office. (Doc. 64-7 at 12 p. 25). At some point, Craig told Adams that the picture is going to be taken regardless. (Doc. 70-2 at 54 p. 149). Keller explained the situation to Adams, and Adams mentioned that she did not want to lose money. (Doc. 64-7 at 12 p. 25). Keller explained that administrative leave is paid and that this is just an investigation. (Id. at 13 p. 26).

Craig recalls telling Keller that Adams was ready to take the picture, but before she took the picture, he wanted an uninterested party present because he knew "how the MFRD is and how things get twisted." (Doc. 70-1 at 54 p. 149). Another captain (Captain Gary Holbein) was brought into the office. (Id.). Adams then agreed to take the picture. (Doc. 64-7 at 13 p. 26). The tattoo was visible to Keller. (Id. at 15 p. 30).

After the picture was taken, Craig and Keller shook hands. (Doc. 70-2 at 55 p. 150). Craig does not have a problem with Ballard or Keller. (Id. at 53 p. 148). Craig testified that at the time, he had no reason to believe that Adams was being asked to take that picture because of her race. (Doc. 64-5 at 43 p. 185).

Lami instructed Keller to write an incident report of the events, which he later submitted. (Doc. 70-3 at 9 p. 47). Keller's Incident Report indicates that Shoots had asked to represent Adams when she was directed to go to Keller's station and that Shoots formally disagreed after Keller denied the request. (Doc. 70-22 at 2). The report also indicates that Craig requested the presence of a representative but that he later stated that "he personally did not think that it was necessary." (Id.). Keller's report explains that Craig stated that Adams had complied with policy since the OPR hearing, but Craig did not know what happened at the hearing. (Id.).

### G. OPR Investigates the Events of September 29, 2022

On October 5, 2022, Craig, Shoots, and Adams received notices that OPR was conducting an investigation for possible policy violations during the events on September 29, 2022. (Doc. 70-23). Browning was the lead investigator. (Doc. 64-3 at 10 p. 35). OPR collected evidence and provided findings of fact to department heads. (Id. at 11–12 pp. 41–42). During OPR's interview of Adams, Adams's attorney was present and questioned the tone of the interview asking whether OPR was conducting an interview or an interrogation. (Doc. 70-6 at 20 p. 74). Adams's attorney also commented during the interview that the interviewers were being "accusatory" and "argumentative." (Id. at 21 p. 75). Shoots also felt like he was interrogated during his interview with OPR. (Doc. 70-5 at 48 p. 187).[3]

On November 5, 2022, OPR's investigative findings on Adams were given to Lami. (Doc. 64-30). OPR found that Adams was in violation of (1) the City's new tattoo policy, (2) MFRD Rule 710 regarding earrings, (3) MFRD Rule 100 and Mobile County Personnel Board ("MCPB") 14.2(h) regarding obeying a supervisor's order, (4) MFRD Rule 100G and MCPB 14.2(h)

---

[3] On October 13, 2022, Rutland was interviewed by OPR. (Doc. 70-8 at 9 p. 34). Rutland characterized his interviewers as generally friendly. (Id.). But OPR found Rutland in violation of policy and Rutland was disciplined as a result. (Doc. 70-8 at 3 p. 14; Doc. 64-10 at 4 p. 15).

regarding insubordination, and (5) MFRD Rule 100B and MCPB 14.2(c) regarding candor. (Doc. 59-30). Browning recalls determining that Adams was in violation of the City's new tattoo policy by reviewing the photo from Keller and Keller and Ballard's incident reports in which they say her tattoo was plainly visible. (Doc. 64-3 at 24 p. 87).

### H. OPR's Findings on Craig

On October 25, 2022, OPR's investigative findings on Craig were given to Lami. (Doc. 70-24). OPR found that Craig was in violation of MFRD and MCPB Rules on three occasions. (Id.).

#### 1. MFRD Rule 400 Fire Service Captain 6: Adams's earrings

OPR found Craig in violation of MFRD Rule 400 Fire Service Captain 6 for failing to investigate, document, and report Adams's violation of MFRD Rule 710 regarding earrings. (Id. at 10). MFRD Rule 400 Fire Service Captain 6 reads: "Shall investigate and document violations of the Rules and Regulations or established policies of the Department, and shall submit such documentation through the chain of command to the Chiefs' Office, with a copy to the violator." (Id.).

OPR based this finding on a corroboration that Busby counseled Craig about Adams's violation of the earring policy following the advisory hearing. (Id. at 11). OPR recognized some confusion over whether MFRD Rule 710 (allowing only one earring per ear) or MFRD Rule 705 (allowing up to two earrings per ear) controlled. (Id.). Regardless, OPR found that Adams violated both rules by reporting on duty on October 17, 2022, with three earrings in each ear. (Id.). Thus, OPR found that Craig violated MFRD Rule 400 Fire Service Captain 6 by failing in his obligation to investigate, document, and report Adams's violation. (Id.).

2. <u>MFRD Rule 100G and MCPB 14.2(h): Ballard's orders</u>

OPR found Craig in violation of MFRD Rule 100G and MCPB 14.2(h) for failing to sustain Ballard's order to Adams to allow Ballard to photo document the status of her tattoo. (<u>Id.</u> at 11–12). MFRD Rule 100G states: "Employees are required to obey directives issued by their supervisors. A refusal to obey a supervisor's order or a lack of respect directed toward that supervisor will subject that employee to the progressive step of discipline program." (<u>Id.</u>). MCPB Rule 14.2(h) prohibits insubordination. (<u>Id.</u>).

OPR based this finding on Adams refusing to allow Ballard to photograph her tattoo and Craig admitting to asking Ballard why he needed to take a photo of Adams's tattoo. (<u>Id.</u> at 12). OPR found it "evident that Craig was questioning Ballard's order in front of Adams." (<u>Id.</u>). OPR referenced Craig saying: "You do know this has already been dealt with, don't you?" (<u>Id.</u>). OPR concluded that "Craig's questioning of Ballard in front of Adams, and his failure to sustain Ballard's order to Adams was insubordinate and in violation of MCPB 14.2 and MFRD 100G." (<u>Id.</u>).

3. <u>MFRD Rule 100G and MCPB 14.2(h): Keller's orders</u>

OPR found Craig in violation of MFRD Rule 100G and MCPB 14.2(h) for failing to sustain Keller's order to Adams to allow Keller to photo document the status of her tattoo. (<u>Id.</u> at 12–13). OPR based this finding on Craig interjecting and continuing to have a discussion with Keller about Adams's request to have legal counsel in front of Adams. (<u>Id.</u> at 12). OPR found Craig "insubordinate when he continued this discussion as it undermined Keller's authority to carry out a lawful directive." (<u>Id.</u>).

## I.    OPR's Findings on Shoots

On November 4, 2022, OPR's investigative findings on Shoots were given to Lami. (Doc. 70-25). OPR found that Shoots was in violation of MFRD and MCPB Rules on three occasions. (Id.).

### 1.    MFRD Rules 100F–G and MCPB 14.2(h): interfering with Ballard's orders

OPR found Shoots in violation of MFRD Rule 100F–G and MCPB 14.2(h) for interfering with Ballard's orders to photograph Adams's tattoo. (Id. at 10). MFRD Rule 100F requires employees to "[c]omply vigorously and conscientiously with all department policies, rules, and directives, both written and oral. (Id.).

OPR based this finding on Shoots interference with Ballard's orders. (Id.). OPR added that "Shoots is not Adams's supervisor and had no cause to interfere with Ballard as part of his official duties that day." (Id.). OPR acknowledged that Shoots was a representative of the PBFA and that he represented Adams's at her advisory hearing, but OPR explained that Shoots's status with the PBFA does not allow him to interfere with MFRD operations. (Id.). OPR noted that Shoots tried reaching the fire chief and the MFRD chief of operations and that Lasky advised Shoots that he could take his own photo of Adams's tattoo for verification. (Id.).

### 2.    MFRD Rules 100G and MCPB 14.2(h): lack of respect to Ballard

OPR found Shoots in violation of MFRD Rule 100G and MCPB 14.2(h) for displaying insubordinate behavior and a lack of respect to Ballard. (Id. at 11). OPR based this finding on Shoots saying: "There will be no pictures today" and "He's not our friend; he's not here to help you." (Id.). OPR considered this language openly defiant and disrespectful. (Id.). OPR concluded that Shoots meant to undermine Ballard's ability to carry out his orders. (Id.).

OPR recognized that Adams, Craig, and Shoots had different recollections of what Shoots told Ballard. (Id.). OPR decided to rely on Ballard's account in his incident report because it was closer

to the incident and because of credibility concerns regarding the testimony of Adams, Craig, and Shoots. (Id. at 11–12).

   3.   MFRD Rules 100F–G and MCPB 14.2(h): ignoring orders to remain at Lathan Station

OPR found Shoots in violation of MFRD Rule 100F–G and MCPB 14.2(h) for ignoring orders to remain at Lathan Station. (Id. at 12). OPR based this finding on Shoots requesting to accompany Adams at Keller's station as her representative. (Id.). OPR indicates that Ballard initially agreed to this request, but Ballard later contacted Shoots and told him to remain in service at Lathan Station. (Id.). OPR found that Shoots ignored this order by calling Keller in an "attempt to countermand Ballard." (Id.). OPR noted that Shoots initially ignored Keller's order and Keller had to inform Shoots that he would be placed on administrative leave pending investigation if he came to Keller's station with Adams. (Id.). OPR relayed that Shoots then emailed several people, including Public Safety Director Lawrence Batiste, Lami, and Keller from progressiveblackfirefighters@gmail.com. (Id.). Shoots's email asked for an explanation for Keller's denial of the opportunity for Shoots to represent Adams. (Id.). OPR concluded that Shoots's email "continues to argue over simple directives and to circumvent the chain of command" and that the MFRD is under no obligation to allow Adams representation by her union at a uniform inspection. (Id.).

**J.   MFRD Discipline**

Craig and Shoots received notices of their pre-disciplinary hearings set for November 21, 2022. (Docs. 70-26–27). The notices listed their charges and outlined the rules they were found to be violating. (Id.). Morris selected the chiefs to sit on the panels. (Doc. 70-2 at 15 p. 41). Both panels included Chiefs Penn, James, Cox, Brown, and Parker. (Docs. 70-28–29). Their job was to make a determination with respect to discipline for Craig's and Shoots's violations. (Doc. 70-2 at 17 p.

45). Prior to the hearing, the committee received the OPR reports of Craig and Shoots. (Doc. 64-4 at 12 p. 22). The committee met for about thirty minutes before the hearings began, (id.), and the hearings were tape recorded. (Id. at 14 p. 24).

Craig attended his hearing and disputed all of his charges. (Doc. 70-1 at 60 p. 181). Shoots attended a hearing with his attorney. (Doc. 64-11 at 37 p. 203). Shoots told the committee that he was just doing his job as a union representative and that he had previously been permitted to make phone calls to Lami. (Doc. 70-5 at 50 p. 204).

The pre-disciplinary hearing committee found Craig in violation of MCPB Rule 14.2(h) for two counts; MFRD Rule 400 Line 6; and MFRD Rule 100(G) for two counts and recommended that Craig receive a thirty-day suspension. (Doc. 70-28 at 2). The pre-disciplinary hearing committee found Shoots to be in violation of both MCPB 14.2(h) and MFRD Rule 100(F)–(G) and recommended Shoots's termination. (Doc. 70-29). The primary reason for the different discipline was the respective discipline history of Craig and Shoots. (Doc. 70-3 at 12 p. 84). Specifically, Shoots already had an extensive MFRD disciplinary record and Craig did not. (Doc. 64-4 at 17 p. 27). Lami had the final decision on the discipline imposed, (Doc. 64-4 at 20 p. 30), and he agreed with the committee's recommendation. (Doc. 70-3 at 11 p. 65).

On November 28, 2022, Craig received a letter from the Mayor advising him of his thirty-day suspension. (Doc. 70-30). Craig has appealed his suspension to the MCPB, which is still pending. (Doc. 70-1 at 61 p. 182). Craig later submitted a grievance over a later performance-review grade reflecting his suspension even though it was appealed, and Chief Frank advised him that if his appeal was successful, his review grade would be adjusted. (Doc. 64-6 at 28 p. 73).

On November 28, 2022, Shoots received a letter from the Mayor advising him of his termination. (Doc. 70-31). Shoots has appealed his termination to the MCPB. (Doc. 70-5 at 3 p. 14).

### K.  Progressive Black Firefighters Association

Shoots currently remains president of the PBFA. (Doc. 64-11 at 3 p. 18). The PBFA's mission is to ensure fairness in hiring, promotion, discipline, and benefits within the MFRD. (Doc. 70-5 at 17 p. 77). The PBFA promotes this mission by working with the administration to voice concerns and navigate change. (Id.). The MFRD has historically engaged with the PBFA by holding EEOC employee relations committee meetings with the PBFA. (Doc. 70-3 at 15 p. 87). The MFRD has also allowed PBFA members to have a representative present during pre-disciplinary hearings (Doc. 70-1 at 8 p. 42). Shoots, as president of the PBFA, typically raised concerns on behalf of the PBFA to Lami via email. (Doc. 70-3 at 16 p. 88). At some point, Shoots changed his email from Captain Shoots to Progressive Black Firefighters. (Id.). Shoots's emails to Lami usually involved the PBFA's mission. (Id. at 17 p. 89).

Around February or March 2022, a black female firefighter (Krysten Richard) with seniority was denied the opportunity to take a course even though she signed up before other white male applicants with less time on the job. (Doc. 70-5 at 10–11 pp. 43–44). Shoots sent Lami a letter asking why a black female firefighter with seniority was denied an opportunity to attend a class. (Doc. 70-5 at 10–12 pp. 43–45). Shoots recalls Frank "maybe" responding that the staffing levels and it being around Mardi Gras went into the determination and that Richard would have to find somebody to swap times with her. (Doc. 70-5 at 12 p. 45). Public Safety Director Battiste had a meeting with Shoots about his letter to Lami. (Id. at 14 p. 47). Shoots recalls Battiste telling him

that Lami felt as if Shoots was calling Lami a racist. (Id.).[4] Shoots also recalls Battiste reminding him that he was employed by the City and that he needed to keep that in mind when sending letters out. (Id. at 15 p. 48). Lami and Shoots did not meet for the last three weeks of Shoots's employment. (Doc. 70-5 at 26 p. 111). Lami testified that Shoots was challenging to work with because some of the things were outside of the MFRD's ability to control. (Doc. 70-3 at 18 p. 90).[5]

### L. Plaintiffs' Current Employment and Lawsuit

In August of 2023, Craig began working for the Prichard Fire Department. (Doc. 64-5 at 4 p. 14). Craig currently serves as fire service captain in Prichard under Shoots, who is Fire Chief in the Prichard Fire Department. (Doc. 64-5 at 4 p. 14).

Craig and Shoots filed a complaint against the City of Mobile. (Doc. 1). The amended complaint alleges discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as made actionable by Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), and the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"), as made actionable by Section 1983. (Doc. 9 at 1).

## II. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby,

---

[4] Shoots does not believe Chief Lami to be a racist. (Doc. 64-11 at 4 p. 50).

[5] Plaintiffs recite nine allegations of past discrimination by the City that occurred between 1998 and 2021. However, Plaintiffs do not reference any of these alleged incidents in their arguments. The Court is unable to discern the relevance of these allegations to the issue in this lawsuit.

Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III.    Analysis

Plaintiffs' amended complaint brings four causes of action: (1) race discrimination under Title VII; (2) retaliation under Title VII; (3) race discrimination in violation of Section 1981 under Section 1983; and (4) race discrimination in violation of the Equal Protection Clause under Section 1983. (Doc. 9). The City moves for summary judgment as to all claims asserted by Plaintiffs. (Doc. 65).

### A.    Race Discrimination: The First, Third, and Fourth Causes of Action

Plaintiffs' first, third, and fourth causes of action allege race discrimination pursuant to Title VII, Section 1981, and Section 1983. (Doc. 9). The legal elements of these claims are identical. See Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985). A plaintiff asserting discrimination under Title VII and under Sections 1981 and 1983 must prove intentional discrimination. Id. "Therefore, we need not discuss [plaintiffs'] Title VII claims separately from [their] [S]ection 1981 and [S]ection 1983 claims." Id.

To survive summary judgment, "a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). A plaintiff can do this in three ways. *First*, by presenting direct evidence of discriminatory intent. See, e.g., Jefferson v. Sewon America, Inc., 891 F.3d 911, 921–22 (11th Cir. 2018). *Second*, by satisfying the McDonnell Douglas burden-shifting framework. Lewis, 918 F.3d at 1220. *Third*, by demonstrating a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination. See, e.g., Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse

employment action was illegal discrimination." Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023), cert. denied sub nom. No. 23-1235, 2024 WL 4426607 (U.S. Oct. 7, 2024).

Plaintiffs do not present direct evidence of discriminatory intent. Likewise, Plaintiffs do not argue that they have satisfied the McDonnell Douglas burden-shifting framework. Instead, Plaintiffs attempt to demonstrate a convincing mosaic of circumstantial evidence that warrants an inference of racial discrimination.

**1. Plaintiffs have not displayed a convincing mosaic of racial discrimination.**

Apart from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting a "convincing mosaic" of "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022). This requires "enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." Tynes, 88 F.4th at 946 (quoting Jenkins, 26 F.4th at 1250).

In proving a convincing mosaic, a plaintiff "may point to any relevant and admissible evidence." Id. at n.2. Probative evidence is likely "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." Id. (quoting Jenkins, 26 F.4th at 1250). The convincing mosaic standard can allow a plaintiff to survive summary judgment even when she cannot identify a similarly situated comparator. Id. However, "[m]ere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

Plaintiffs argue that they "have submitted many tiles which when viewed in totality comprise a mosaic sufficient to support an inference of discrimination." (Doc. 69 at 21). This evidence

includes (1) the series of events that ultimately led to Craig's suspension and Shoots's termination originating from a "chance meeting" between Rutland and Frank; (2) the MFRD sending Ballard to take Adams photo rather than calling Craig to document Adams's tattoo; (3) the fact that Keller was asked to check Adams's compliance with the grooming policy; (4) Lasky telling Shoots that he did not know what was going on the day the picture was taken; (5) OPR's investigative process; (6) OPR's recommendation that Craig be suspended and Shoots be terminated; (7) Shoots being charged with interfering with Ballard's inspection despite his history of reaching out to Lami; (8) OPR accepting Ballard's version of events; (9) Lami changing his approach with the PBFA during Shoots's last three months of employment; and (10) Busby's "ominous" warnings to Craig and Shoots. (Doc. 69 at 24–27).

i.    Plaintiffs' evidence does not show an inference of race discrimination.

Considering all the evidence, Plaintiffs have not provided a convincing mosaic of discrimination sufficient to survive summary judgment. At this stage, the Court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Those reasonable inferences, however, must demonstrate not just ambiguity or suspicious timing. The reasonable inferences must show that the City's motivation behind Craig's suspension and Shoots's termination was unlawful discrimination on the basis of race. Plaintiffs have not met this burden.

For example, Plaintiffs argue that Rutland's "chance meeting" with Frank where Rutland told Frank that Adams's tattoo was visible was "anything but chance." But Plaintiffs do not explain how Rutland telling Frank about Adams's tattoo demonstrates an inference of discrimination against Craig and Shoots by the City. Plaintiffs must show "a convincing mosaic of circumstantial evidence that would allow a jury to infer . . . intentional discrimination by the decisionmaker."

Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Rutland was not the decision maker, so the fact that he spoke with Frank about Adams's tattoo is not relevant.

Plaintiffs argue that the MFRD asking Keller to check on Adam's compliance and Keller asking Ballard to take Adams's photo is suspicious. But the record shows that Lami and Lasky discussed the proper way to document Adams's tattoo and that Lami decided to send a supervisor (Keller). Keller instructed Ballard to carry out the task because Ballard was responsible for Lathan Station that day. Plaintiffs argue for an inference of discrimination because Keller had never been asked to see whether someone was in compliance with the MFRD's grooming policy. (Doc. 69 at 24). However, Lami testified that this is something the MFRD has done in the past (i.e., send a supervisor to address a grooming policy violation). (Doc. 64-8 at 10 p. 42). "Departures from normal procedures may be suggestive of discrimination." Morrison v. Booth, 763 F.2d 1366, 1374 (11th Cir. 1985). But sending a supervisor to address a grooming policy is not a departure from the MFRD's normal procedure.

Plaintiffs summarily allege that Lasky made ambiguous statements to Shoots on September 29, 2022, that raise "suspicions of the MFRD's intent to punish Shoots and Craig." (Doc. 69 at 25). The record shows that Lasky advised Shoots to take his own picture of Adams's tattoo for documentation (both Shoots and Lasky recall this). Shoots recalls Lasky saying that he had not heard anything about a picture of Adams's tattoo—which Plaintiffs find suspicious. But Plaintiffs have not argued how Lasky's statements show an inference of intentional racial discrimination by the City, and the Court is unable to discern that inference.

Plaintiffs argue that OPR's investigative process raises suspicions for two reasons. First, Plaintiffs argue that it is suspicious that Shoots described his interview as more of an interrogation and Rutland described his interviewers as friendly. Although Shoots takes issue with the tone of

the questioning, the fact remains that both Rutland and Shoots were found to be in violation of rules by OPR.[6] There is simply insufficient evidence in the record to infer that the OPR investigators discriminated against Shoots based on his race.

Second, Plaintiffs believe that OPR's findings are "completely contradicted by the record." (Doc. 69 at 25). But there is insufficient evidence of this as well. Specifically, Plaintiffs point to Craig being charged with failing to investigate Adams's earrings as one contradiction. OPR explained that "Craig had an obligation to investigate, document, and report" Adams's violation of policy and that he failed to do so. (Doc. 70-24 at 11). Plaintiffs contend that because Craig counseled Adams on this issue, a finding that he did not investigate, document, and report is contradictory. There is no evidence that Craig documented or reported the violation; therefore, there is no contradiction. Moreover, OPR findings indicate that Adams showed up to her October 17, 2022, interview with three earrings in each ear. (Doc. 70-24 at 11). And Adams's testimony affirms this. (Doc. 70-4 at 27 p. 200). Whether Craig saw Adams before October 17, 2022, is beside the point. Craig's counseling was apparently insufficient to address the issue.

Plaintiffs also point to Craig being charged with failing to sustain Ballard's order to allow the photograph of the tattoo and with questioning Ballard in front of Adams as a contradiction. OPR found that Adams refused to take the picture and that "Craig admitted to asking Ballard why he needed to take" the photo. (Doc. 70-24 at 12). The record undisputedly shows that Ballard advised Craig and Adams that he needed to view Adams's tattoo, and that Adams declined. (Doc. 70-21 at 2). Both OPR's findings and the record show that Craig questioned Ballard's order by saying: "You know that this has already been dealt with, don't you?" (Doc. 70-21 at 2; Doc. 70-24 at 12).

---

[6] Rutland received discipline as a result of OPR's investigation concerning Adams's complaint against him. (Doc. 70-8 at 3 p. 14; Doc. 64-10 at 4 p. 15).

OPR's findings corroborate Craig making this statement with Ballard's Incident Report and Craig. (Doc. 70-24 at 12). There is no contradiction here.

Plaintiffs' statement that Keller "did not believe Craig to be in violation of any MFRD rule" suffers from a lack of clarity. (Doc. 69 at 25). Keller was asked whether he would find that Craig violated *MFRD Rule 100G* based on *his* interaction with Craig that day. (Doc. 70-10 at 14 p. 33). Keller responded no. (Id.). But the record does not show that Keller was asked whether he believed Craig was in violation of any MFRD rule that day, and Keller testified that he was not surprised that Craig was suspended. (Doc. 70-10 at 16 p. 39).

Plaintiffs also allege that "no one in the history of MFRD has ever been disciplined for failing to sustain an order." (Doc. 69 at 25) (citing Doc. 70-1 at 62 p. 184; Doc. 70-10 at 14 p. 33). This, too, suffers from a lack of clarity. In support of this statement, Plaintiffs cite the testimony of Craig and Keller. Craig stated at his deposition: "I think I may be a trailblazer here. This is unheard of in the Mobile Fire Department. I mean, not sustaining an order." (Doc. 70-1 at 62 p. 184). Keller was asked if he had known of an officer, captain, or chief being disciplined for failure to sustain an order. (Doc. 70-10 at 14 p. 33). He responded no and elaborated that in his opinion either you either follow a directive or not—apparently taking issue with the term "sustain" an order. The record is silent as to whether anyone had ever been disciplined for failing to sustain an order.  But even assuming this is true, this fact is insufficient to sustain Craig's burden to show a convincing mosaic that he was disciplined based on his race.

As to Shoots, his allegations meet the same fate as Craig's. First, Plaintiffs argue that Shoots should not have been charged with interfering with Ballard's inspection by reaching out to Lami and Lasky. (Doc. 69 at 26). But Plaintiffs fail to argue how OPR's finding on Shoots's interference demonstrates discrimination on the basis of race. Plaintiffs make the wholly conclusory and totally

unsupported statement that OPR "decided to accept Ballard's version of events merely because Shoots and Craig were president and vice president of the PBFA." (Doc. 69 at 26). Their evidence in support is that Shoots was charged with failing to obey the order to remain at Lathan Station and that the report concerning Shoots "clearly contains language implying a bias towards him." (Id.). Yet, OPR articulated why Shoots was being charged with failing to obey the order to remain at Lathan Station[7] and how it reconciled the different accounts of events. No reasonable factfinder could rely on OPR's finding to infer that the City displayed racial discrimination towards Shoots.

Shoots next alleges that Lami changed his approach towards him before he was terminated and that Lami refused to meet with Shoots altogether during Shoots's last three months of employment. (Doc. 69 at 26). Plaintiffs suspect that Lami's actions are related to Public Safety Director Battiste allegedly informing Shoots that Lami believed that Shoots was calling him a racist. (Id.). Shoots testified that Lami "refused" to meet with him and recalls multiple times in the last three months of his employment where Lami would set a date to meet with him and then cancel. (Doc. 70-5 at 25–26 pp. 110–11). But Shoots also testified that he does not believe Lami to be a racist. (Doc. 64-11 at 4 p. 50). Stated simply, racial discrimination cannot be reasonably inferred from the fact that Lami did not meet with Shoots during the last three months of Shoots's employment.

Plaintiffs also argue that the purported reason for the different punishment for Shoots and Craig—their different discipline history—supports a convincing mosaic of discrimination. (Doc. 69 at 26). First, the Court is puzzled as to how comparing the discipline of Craig (an African

---

[7] Shoots ignored Ballard's order to remain at Lathan Station and called Keller. Keller had to inform Shoots that he would be placed on administrative leave if he came to Lathan Station. Shoots then emailed several people asking for an explanation. Plaintiffs argue that Shoots "did not argue with any directive" citing Ballard's and Keller's testimony. *Ballard* testified that Shoots did not argue with him, (Doc. 70-9 at 11 p. 27), and the OPR report does not dispute this. But Keller testified that Shoots disagreed with *Keller*'s order and wanted something in writing to express his disagreement. (Doc. 70-10 at 5 p. 20). Further, Shoots sent emails questioning his order to stay at Lathan Station. Shoots appears to have argued with *Keller*'s order in multiple ways.

American male) with the discipline of Shoots (an African American male) advances the allegation of race discrimination against Shoots. Second, Plaintiffs acknowledge that Shoots and Craig had different discipline history. The record indicates that Craig had no prior disciplinary history. Meanwhile, Shoots had been demoted, had received verbal counseling seven times, and had received a written reprimand once. Although Shoots's most serious discipline (his demotion) occurred in 2010, Craig and Shoots had vastly different discipline records.

Finally, Plaintiffs allege that Busby made ominous statements to Craig and Shoots. Specifically, Busby told Shoots: "Take care of your people and tell Ms. Adams to get a big gun." Likewise, Busby told Craig to protect his troops. Plaintiffs point out that Craig and Shoots are African American captains overseeing a station with a crew comprised of majority African Americans and that they serve as president and vice president of the PBFA. Plaintiffs believe this supports a reasonable inference of MFRD's discriminatory intent. The Court is not sure what reasonable inference could be made from this statement. However, the statement is not sufficient to support a convincing mosaic of intentional discrimination against Shoots or Craig based on their race.

ii.     Plaintiffs' evidence does not show pretext for discrimination.

Because Plaintiffs are not arguing that this is a prima facie case of discrimination, the pretext step of the burden-shifting framework does not apply. However, establishing pretext is often a key component of a convincing mosaic because it shows that discrimination was the real reason for the action. See Tsavaris v. Savannah L. Sch., LLC, 847 F. App'x 634, 637 (11th Cir. 2021) (affirming district court conclusion that plaintiff "failed to present a convincing mosaic of circumstantial evidence because . . . she failed to show pretext."). The Eleventh Circuit has explained that a plaintiff "may point to any relevant and admissible evidence" to prove a

convincing mosaic, but probative evidence likely demonstrates, among other things, "pretext." Tynes, 88 F.4th at 947.

An employee shows pretext by casting sufficient doubt on the employer's offered nondiscriminatory reason for taking the employment action. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). An employee does this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. However, a "reason is not pretext for discrimination 'unless it is shown both that the reason was false, *and that discrimination was the real reason*.'" Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis added) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Further, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." Landry v. Lincare, Inc., 579 F. App'x 734, 738 (11th Cir. 2014) (citing Damon v. Fleming Supermarkets Of Fla., Inc., 196 F.3d 1354, 1363 (11th Cir. 1999)).

The City offers legitimate, race neutral reasons for suspending Craig and terminating Shoots. Craig and Shoots failed to carry out the rules and directives of MFRD as captains. Craig received a suspension because he had no discipline record. Shoots was terminated because he had a discipline record. Plaintiffs points to the same evidence that they believe show a convincing mosaic of race discrimination to argue that the City's reasons for disciplining Plaintiffs are pretextual. Specifically, Plaintiffs argue that "contrary to the OPR's findings, neither Craig nor Shoots failed to carry out any MFRD rule or regulation." (Doc. 69 at 28). But OPR's findings explain how it concluded that Craig and Shoots violated policy, and OPR did not discipline Craig or Shoots. OPR gave its findings to the MFRD, who convened a pre-disciplinary hearing. The pre-disciplinary

hearing committee relied on OPR's findings to recommend Plaintiffs' respective discipline. Even if the findings in OPR's reports were mistaken, Plaintiffs have failed to show that the City's actions were discriminatory. <u>Landry</u>, 579 F. App'x at 738 (citing <u>Damon</u>, 196 F.3d at 1363) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). Thus, a reasonable factfinder could not find that the City's reasons were pretext for discrimination.

### 2. Plaintiffs' discrimination claims cannot survive under the mixed-motive theory.

Plaintiffs alternatively argue that their discrimination claims can survive under the mixed-motive theory. This is an alternative theory of causation for proving discrimination. <u>McCreight v. AuburnBank</u>, 117 F.4th 1322, 1331 (11th Cir. 2024).[8] "Mixed-motive discrimination . . . allows for liability when an employment decision motivated by a *legitimate* reason—usually poor work performance—is also infected by an *illegitimate* reason—illegal discrimination." <u>Id.</u> at 1326. A plaintiff only needs to show that an illegal reason played a part in the decision—not that it was dispositive. <u>Id.</u> at 1331. Still, a plaintiff alleging mixed-motive discrimination must provide "sufficient evidence for a reasonable jury to infer intentional discrimination". <u>Id.</u>

Plaintiffs reference the same allegations of facts they use to argue that there is a convincing mosaic of race discrimination. Again, this evidence does not sustain an inference that Craig and Shoots were disciplined because of their race. The evidence also fails to establish that race was a motivating factor in their discipline.

---

[8] Mixed-motive theory offers the same potential remedies (compensatory and punitive damages plus back pay and injunctive relief). "But there is one important difference: if a plaintiff prevails under a mixed-motive theory, an employer can still avoid damages and certain equitable relief by showing that it would have taken the same action even without the illegal motivation." <u>McCreight v. AuburnBank</u>, 117 F.4th 1322, 1332 (11th Cir. 2024).

At bottom, Plaintiffs have failed to present sufficient evidence for a reasonable jury to infer that the City discriminated against them based on their race. Therefore, the City's motion for summary judgment is **granted** as to the first, third, and fourth causes of action alleging discrimination.

### B. Retaliation Claim: The Second Cause of Action

Plaintiffs' second cause of action alleges retaliation pursuant to Title VII. (Doc. 9). Plaintiffs claim that the City retaliated against them for opposing the MFRD's disparate treatment of Adams and for calling attention to other racially discriminatory practices and policies within the MFRD. (Doc. 69 at 29). Plaintiffs make two arguments for retaliation: (1) a prima facie case of retaliation and (2) a convincing mosaic of retaliation.

### 1. A prima facie case of retaliation.

The Eleventh Circuit "has 'primarily' relied on the McDonnell Douglas framework to evaluate circumstantial-evidence-based employment claims at summary judgment." Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1337 (11th Cir. 2023). As such, a prima facie claim of retaliation under Title VII requires that the plaintiffs show: (1) that they engaged in a statutorily protected activity; (2) that they suffered an adverse employment action; and (3) that they established a causal link between the protected activity and the adverse action. See, e.g., Bryan v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009). Establishing these elements creates a presumption that the adverse action was retaliation. Id. at 1308. "If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual and that the real reason was retaliation. Id. "Importantly, throughout this entire process, the ultimate

burden of persuasion remains on the employee." Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*).

Neither party disputes that Craig and Shoots suffered adverse employment actions. Therefore, the questions are (1) whether they engaged in statutorily protected activity, and (2) whether they established a causal link between the protected activity and the adverse actions.

To engage in protected activity, an employee must explicitly or implicitly communicate a belief that the employer's conduct constitutes unlawful employment discrimination. Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016). "In addition, a plaintiff is required to show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" Id. (citing Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)). Therefore, the plaintiff must show that she subjectively believed the defendant was engaged in unlawful employment practices and that her belief was objectively reasonable. Id. The plaintiff is not required to prove that the discriminatory conduct was actually unlawful, but only that the conduct was "close enough to support an objectively reasonable belief" that it was unlawful. Id. (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999)).

Plaintiffs argue that they have alleged sufficient facts to allow for a reasonable inference that they engaged in a statutorily protected activity. (Doc. 69 at 29). In support, Plaintiffs reference Craig and Shoots involvement in the PBFA and their history of raising issues and submitting complaints regarding hiring, discipline, and promotional practices to the department and Lami. (Doc. 70-3 at 16–18 pp. 88–90). Specifically, Plaintiffs point to February or March 2022 when the PBFA filed a complaint questioning why a black female firefighter with seniority (Krysten Richard) was not allowed to take administrative leave to attend certain classes. (Doc. 70-5 at 10–

12 pp. 43–45). Shoots also sent Lami a letter asking why Richard was denied the opportunity despite having more time on the job than the male applicants. (Doc. 70-5 at 10–12 pp. 43–45). Additionally, Plaintiffs argue that they engaged in protected conduct by supporting Adams in her belief that she was being singled out for her tattoo based on race. (Doc. 69 at 30). Specifically, on September 29, 2022, Craig and Shoots supported Adams's request to have union and/or legal representation. (Doc. 70-9 at 10–11 pp. 26–27; Doc. 70-10 at 5–6 pp. 20–21).

The City argues that Plaintiffs cannot demonstrate that they engaged in protected activity. (Doc. 66 at 22). Regarding Plaintiffs' actions concerning Adams, the City argues that "the undisputed facts demonstrate that Plaintiffs Shoots and Craig did not tie their actions to any sort of illegal discrimination." (Id.). The City points to Craig's testimony that he did not believe that Adams was being asked to take the picture of her tattoo based on her race. (Doc. 64-5 at 43 p. 185). The City also points to Shoots's testimony that he felt he was wearing the hat of union representative, not his captain's hat, when he was involved with Adams's issues. (Doc. 64-11 at 25–26 pp. 161, 163). Regarding Plaintiffs' history of raising issues and submitting complaints, the City argues that the complaints lack temporal proximity with the alleged retaliation. (Doc. 72 at 11). In short, the City characterizes Plaintiffs' conduct as articulating general unfairness regarding Adams's treatment. (Doc. 66 at 22).

i.    <u>A reasonable jury could not find that Craig engaged in statutorily protected activity.</u>

The record does not support that Craig had a good faith, reasonable belief that the MFRD was engaged in unlawful practices. Craig testified that he did not believe Adams was being asked to take a picture of her tattoo because of her race. (Doc. 64-5 at 43 p. 185). Craig accompanied Adams to Keller's office to have her picture taken and told Keller that Adams wanted legal counsel to advise her if she could get the picture taken. (Doc. 70-10 at 7 p. 22). But Keller's Incident Report

indicates that Craig stated that he personally did not think representation for Adams was necessary. (Doc. 70-22 at 2). Craig has not disputed this.  More important, Craig did not allege that the MFRD was discriminating against Adams based on protected characteristics. So any complaints that Craig made as to Adams were, at best, general allegations of unfairness that were not tethered to any allegation of race or sex discrimination.

Absent any allegation that the MFRD was discriminating against Adams, Craig's statement that Adams should have legal counsel present is not statutorily protected conduct. Bowens v. Escambia Cnty. Bd. of Educ., No. 22-11560, 2023 WL 4145424, at *4 (11th Cir. June 23, 2023) ("Absent any allegation about discrimination based on a protected ground, Plaintiff's grievances alleging unfair treatment were not statutorily-protected conduct."). Therefore, a reasonable juror could not conclude that Craig engaged in statutorily protected activity, and Craig cannot make a prima facie case of retaliation.

Apart from "the McDonnell Douglas framework, an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent." Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1310 (11th Cir. 2023).[9] "Some [Eleventh Circuit precedent] refer[s] to this evidentiary approach as the 'convincing-mosaic framework.'" Id. at 1310–11. "But a 'convincing mosaic' is a metaphor, not a legal test and not a framework." Id. at 1311. "The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." Id. "At the end of the day, a retaliation plaintiff's 'mosaic' of evidence must still be

---

[9] Only twice has the Eleventh Circuit in a published opinion explicitly held that a plaintiff can prove retaliation through the convincing mosaic approach. Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1314 (11th Cir. 2023) (Abudu, J., concurring). "Ostensibly, this development seems progressive; in practice, it is unlikely to yield any meaningful results for plaintiffs who cannot succeed on a retaliation claim under the McDonnell Douglas framework." Id.

enough to allow a reasonable jury to infer but-for causation." Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1342 (11th Cir. 2023).

Here, Craig argues that his retaliation claims survive summary judgment under the convincing mosaic standard because they survive summary judgment under the more exacting McDonnell Douglas standard. (Doc. 69 at 32). However, Craig's retaliation does not survive under that framework. Therefore, the issues are (1) whether the circumstantial evidence establishes a convincing mosaic of retaliation and (2) whether that mosaic can allow a reasonable jury to infer but-for causation between Craig's protected conduct and the City's adverse action.

Again, the record does not support that Craig had a good faith, reasonable belief that the MFRD was engaged in unlawful practices. Craig testified that he did not believe that the MFRD was discriminating against Adams by taking a photograph of her tattoo. And the record indicates that Craig did not personally think representation for Adams was necessary. Thus, Craig cannot show that he engaged in statutorily protected conduct, and a reasonable jury could not infer that Craig was retaliated against. The City's motion for summary judgment is **granted** as to the second cause of second cause of action alleging retaliation against Craig.

    ii.    Whether Shoots engaged in statutorily protected activity is carried to trial.

The record indicates that Shoots has a history of raising race-related issues to the MFRD and Lami. (Doc. 70-3 at 16–18 pp. 88–90). Shoots typically contacted Lami via email to raise concerns on behalf of the PBFA. (Id.). For example, Shoots emailed Lami asking why a black female firefighter with seniority was denied an opportunity. (Doc. 70-5 at 10–12 pp. 43–45). Shoots recalls Lami "feeling like [Shoots] was calling [Lami] a racist when [Shoots] wrote the letter saying that the practice that's being used to select individuals for classes appears to be discriminatory and does not abide by the City of Mobile's equal opportunity statement." (Id. at 14

p. 47). Shoots has explicitly communicated a belief that the MFRD's conduct related to selecting individuals for classes constituted unlawful discrimination. Therefore, Shoots had engaged in statutorily protected activity in the past.

On September 29, 2022, Shoots called Keller concerning the MFRD's attempt to secure a picture of Adams's tattoo. (Doc. 70-10 at 5 p. 20). Shoots stated that he wanted to represent Adams when she went to Keller's office. (Id.). When Keller told Shoots that the directive was for only Craig to accompany Adams as her immediate supervisor, Shoots stated that he disagreed and wanted something in writing to state that he was denied the opportunity to represent Adams. (Id.). Unlike Craig, Shoots has not testified that he did not believe that Adams was being discriminated against based on her race. And while the Court previously found that Adams cannot show that a reasonable jury would find that the photo incident was based on her race, in order to show retaliation, Shoots need only show that he held an objectively reasonable belief that Adams was being singled out for tattoo policy enforcement based on her race. The Eleventh Circuit tells us that to be objectively reasonable, the conduct at issue must be "close enough" to discrimination. Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999). No further guidance from the Eleventh Circuit has been provided. However, as a sister court has recognized in attempting to define "close enough":

> [T]he purposes of the anti-retaliation and anti-discrimination provisions are different. As the Supreme Court has explained,
>
>> The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct.

White, 548 U.S. at 63, 126 S. Ct. 2405 (internal citation omitted). Third, it avoids placing an onerous burden on the plaintiff's prima facie case of retaliation. See Burdine, 450 U.S. at 253, 101 S. Ct. 1089 (holding that under the McDonnell Douglas framework the "burden of establishing a prima facie case . . . is not onerous"). Finally, it prevents courts from engaging in an arbitrary evaluation of the underlying claim's likelihood of success.

Taylor v. Cardiovascular Specialists, P.C., 4 F. Supp. 3d 1374, 1380 (N.D. Ga. 2014).

Shoots has a history of raising race-related complaints on behalf of the PBFA members. And his actions should be viewed in the context of his experience that allegedly white males with tattoos were not investigated in the past. While these white males are not appropriate comparators for Adams, they are evidence to be considered as to whether Shoots had an objectively reasonable belief.

       iii.    Whether there is a causal link between his discipline and his statutorily protected activity.

"Both at the prima facie stage and at the stage of analysis after which the defendant has articulated a legitimate, nonretaliatory reasons for its action, the plaintiff is called on to show that the evidence demonstrates the requisite causal connection." Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1294 (11th Cir. 2021).

At the prima facie stage, the plaintiff can prove a causal link by showing "that the protected activity and the adverse action were not wholly unrelated." Id. (quoting Gogel, 967 F.3d at 1135). A plaintiff can prove this "by showing close temporal proximity between the statutorily protected activity and the adverse . . . action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). However, "mere temporal proximity, without more, must be very close". Id.

If the defendant has rebutted the prima facie case with a legitimate, nonretaliatory reason, the plaintiff must meet the but-for test—which is more demanding. Tolar, 997 F.3d at 1294. The but-for standard asks whether 'a particular outcome would not have happened "but-for" the purported

cause.'" <u>Yelling v. St. Vincent's Health Sys.</u>, 82 F.4th 1329, 1338 (11th Cir. 2023) (quoting

<u>Bostock v. Clayton Cnty.</u>, 590 U.S. 644, 656 (2020)). "Stated another way, a plaintiff must prove

that had she not complained, she would not have been fired." <u>Id.</u> (quoting <u>Jefferson v. Sewon Am.,</u>

<u>Inc.</u>, 891 F.3d 911, 924 (11th Cir. 2018)).

Here, at the prima facie stage, Shoots must prove that his conduct and his termination were not

wholly unrelated. "To demonstrate a causal connection between a protected activity and an adverse

employment action, the plaintiff must show that: (1) the decisionmakers knew of his protected

activity; and (2) the protected activity and adverse action were not wholly unrelated." <u>Harris v.</u>

<u>Fla. Agency for Health Care Admin.</u>, 611 F. App'x 949, 951 (11th Cir. 2015) (citing <u>Shannon v.</u>

<u>Bellsouth Telecomm., Inc.</u>, 292 F.3d 712, 716 (11th Cir. 2002)). In most cases, a close temporal

proximity between the protected conduct and the adverse action shows that they are not wholly

unrelated. <u>Id.</u> But "[a] three to four month disparity between the statutorily protected activity and

the adverse employment action is not enough." <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361,

1364 (11th Cir. 2007). Without other evidence tending to show causation, a substantial delay

between the activity and the adverse action results in a retaliation claim failing as a matter of law.

<u>Id.</u>

Shoots argues that the MFRD was aware of various complaints of race discrimination that he

submitted as President of the PBFA to Lami. (Doc. 69 at 31). On September 29, 2022, Shoots

requested to accompany Adams to Keller's office as her representative and complained when he

was not allowed (Doc. 70-10 at 5 p. 20). This request was made approximately two months prior

to receiving their official notices of suspension and termination on November 28, 2022. (Docs. 70-

30–31).

The record shows that MFRD was aware of Shoots's conduct. The issue is whether there is a causal link between his alleged protected activity and his discipline. Shoots requested to accompany Adams to have her picture taken on September 29, 2022, and formally disagreed with the MFRD's decision denying his request the same day. Shoots was disciplined on November 28, 2022. However, the investigation and disciplinary proceedings started soon after the September 29, 2022, event. And the conduct that occurred on September 29, 2022, is the clear basis for the discipline.

      iv.    <u>The City has offered a legitimate, nonretaliatory reason for the adverse action.</u>

The employer's burden of producing a legitimate, nonretaliatory reason for an employment action is merely one of production. <u>Knox v. Roper Pump Co.</u>, 957 F.3d 1237, 1245 (11th Cir. 2020). The City argues that it has articulated a legitimate, nondiscriminatory, and nonretaliatory reason for Shoots termination: namely, his failure to carry out the rules and directives of the MFRD as a captain within the department. (Doc. 66 at 19, 24). In support, the City cites <u>Veasy v. Sheriff of Palm Beach Cnty.</u>, 746 F. App'x 816, 819 (11th Cir. 2018). In <u>Veasy</u>, the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the employer because the employee failed to show that his termination was the product of race discrimination. <u>Id.</u> at 821. There, the court explained that the employer articulated a legitimate, nondiscriminatory reason for the employee's termination. <u>Id.</u> at 819. The employer's stated reasons were that the employee repeatedly refused to comply with a direct order to submit to drug testing and that this incident was one in a long line of insubordination offenses. <u>Id.</u>

The City has provided a legitimate, nonretaliatory reason for discipling Craig and Shoots. The Eleventh Circuit has explained that an employer demonstrates a legitimate, nondiscriminatory reason for firing an employee by pointing to "several specific acts of insubordination by the

employee." <u>Carter v. City of Miami</u>, 870 F.2d 578, 584 (11th Cir. 1989). Craig and Shoots were disciplined, in part, for insubordination and the failure to obey directives. Because the City has articulated a legitimate reason, the burden shifts to the Plaintiffs to prove pretext.

> v.    <u>Whether the evidence supports an inference of pretext for retaliation against Shoots is carried to trial.</u>

Shoots argues that there are questions of fact that cast sufficient doubt as to whether the City's purported reasons for discipline were pretextual. (Doc. 69 at 32). In support, Shoots points to the same evidence that they believe demonstrates a convincing mosaic of racial discrimination. The totality of this evidence fails to display a convincing mosaic of race discrimination. However, this pretext-inquiry is not based on whether the evidence supports race discrimination. Rather, the question is whether the evidence supports an inference of pretext for retaliation.

"[T]o establish pretext for retaliation, an employee must prove that the employer's reason 'was false' and that 'retaliation was the real reason.'" <u>Berry v. Crestwood Healthcare LP</u>, 84 F.4th 1300, 1308 (11th Cir. 2023). "[I]n determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her." <u>Gogel v. Kia Motors Mfg. of Georgia, Inc.</u>, 967 F.3d 1121, 1136 (11th Cir. 2020). "[E]vidence of causation can be used to prove pretext." <u>Berry</u>, 84 F.4th at 1309. Whether there is evidence sufficient to show that the City's reasons for discipline were pretext for retaliation requires that Plaintiffs meet the but-for test.

Ultimately, the burden of proving causation on retaliation remains with the plaintiff. Plaintiffs must offer "enough evidence from which a reasonable juror could conclude that [their] protected activity was causally linked to his termination." <u>Knox v. Roper Pump Co.</u>, 957 F.3d 1237, 1245 (11th Cir. 2020). At the pretext-rebuttal stage, the but-for test is applied. "That is, the plaintiff must

show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1294 (11th Cir. 2021). Shoots must prove that had he not intervened and requested to represent Adams at Keller's office, he would not have been fired. See id.

The mixed-motive framework does not apply to Title VII retaliation claims. Yelling, 82 F.4th at 1338. Thus, it is not enough for a plaintiff to "show that a protected consideration contributed in some way to the outcome." Id. at 1339. However, there can be multiple but-for causes as long as "each could be viewed as 'the straw that broke the camel's back.'" Id. at 1339 (quoting Burrage v. United States, 571 U.S. 204, 211 (2014)). "If there are multiple but-for causes, the removal of any one would change the outcome" because "[e]ach would be a 'necessary condition for the outcome.'" Id. (quoting Restatement (Third) of Torts § 26 cmt. b (Am. L. Inst. 2010)).

**The City's motion for summary judgment is carried to trial as to the second cause of action alleging retaliation against Shoots.**

### IV.    Conclusion

Plaintiffs have failed to demonstrate that the City discriminated against them. Thus, summary judgment is **granted** as to the first, third, and fourth causes of action alleging **discrimination**. As to the second cause of action, Craig has failed to show he engaged in protected activity. Therefore, summary judgment is **granted** as to the second cause of action alleging **retaliation against Craig**. Summary judgment is **carried to trial** as to the second cause of action alleging **retaliation against Shoots**.

**DONE** and **ORDERED** this **27th** day of **November 2024**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**